# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

SUELLEN BLADEK,

         Plaintiff,

    v.                                      Case No. 04-C-715

THE VILLAGE OF CAMPBELLSPORT,

         Defendant.

## DECISION AND ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I. PROCEDURAL AND FACTUAL BACKGROUND

This action was commenced on July 23, 2004, when the plaintiff, Suellen Bladek, ("Bladek") filed a complaint in the United States District Court for the Eastern District of Wisconsin alleging that she was retaliated against for exercising her First Amendment rights, in violation of 42 U.S.C. § 1983. The plaintiff alleges that the defendant deprived the plaintiff of her First Amendment right to freedom of speech by terminating the plaintiff based upon the statements she made regarding issues of public concern.

Currently pending before the court is the defendant's motion for summary judgment which is fully briefed and is ready for resolution. For the reasons which follow, the defendant's motion for summary judgment will be granted in part and denied in part.

In accordance with the provisions of Civil Local Rule 56.2(a) (E.D. Wis.), the defendant's motion for summary judgment was accompanied by a set of proposed findings of fact. Likewise, the plaintiff's response to the defendant's motion for summary judgment contained responses to the

defendant's proposed findings of fact as well as some additional proposed findings of fact. A review of the parties' respective proposed findings and the responses thereto reveal that the following are material and (except where noted) undisputed facts that are relevant to the disposition of the defendant's motion for summary judgment.

Bladek is the former Library Director of the Village of Campbellsport. (Defendant's Proposed Findings of Fact ("DPFOF") ¶ 5.) Joan Hoff ("Hoff") at all times relevant hereto was the president of the Village of Campbellsport Library Board ("Library Board"), which oversees the actions of the library and its director. (DPFOF ¶ 6.)

Hoff became the Library Board President in the fall of 2003. (DPFOF ¶ 27.) Hoff is a volunteer on the Library Board acting in an attempt to help the library and the community, without remuneration. (DPFOF ¶ 28.)

Bladek was hired as Library Director for the Village of Campbellsport in July of 1997. (DPFOF ¶ 21.) According to Bladek her duties as Library Director included circulation management, reference management, material selection, drafting and implementing an annual budget, attending monthly Library Board and Village Board meetings and coming up with programming for children and adults at the library. (DPFOF ¶ 22.)

After Bladek was hired in July of 1997 she claims that she never had any disciplinary problems or was never reprimanded until Hoff took over as Library Board President in the fall of 2003. (DPFOF ¶ 23.) However, under questioning she did admit that she had been reprimanded for personal use of long-distance calls and had been forced to pay back the Village of Campbellsport for same. (DPFOF ¶ 24.)

2

Many of the personnel evaluations in the Campbellsport file of Bladek are positive. However, it has come to light that Bladek simply wrote an evaluation of herself and placed it in the library file without it ever having been reviewed by anyone on the Library Board or the Village Board. (DPFOF ¶ 25.) Basically, Bladek agreed that she had "papered" her file with positive evaluations. (DPFOF ¶ 26.)

After an audit of the Library's phone bills was conducted, Bladek was required to pay back $300 to the Village of Campbellsport for long distance calls she made. (DPFOF ¶ 63.) Bladek could have been terminated for this infraction alone. (DPFOF ¶ 64).

During the course of Bladek's employment she took on a paid position at the junior high school coaching the girl's volleyball team. (DPFOF ¶ 66). On one particular occasion Bladek called in sick to the library and was later seen at the junior high school. (DPFOF ¶ 68).

Deb Senn ("Senn") has been on the Library Board since July of 1999. (DPFOF ¶ 78). Senn was a member of the personnel committee on the Library Board. (DPFOF ¶ 79). According to Senn, prior to Hoff taking over as Library Board President, there had been no performance evaluations of Bladek for a number of years. (DPFOF ¶ 80).

In discussing how performance evaluations of the Library Director should be conducted, it was decided that no one person should be responsible for providing an evaluation. (DPFOF ¶ 81). It was therefore decided that the personnel committee would be formed in order to deal with staff issues and performance evaluations. (DPFOF ¶ 82). None of the Board members felt it was fair to put the onus on one particular person to evaluate the Library Director. (DPFOF ¶ 83).

3

On December 2, 2003, Bladek received a verbal warning from the Library Board, reduced to written form. Said warning stated: "At the Library Board Meeting of December 1, 2003, many errors were again noted in financial reports provided to the Board by Suellen Bladek, Library Director. I gave her a verbal warning urging her to improve her work habits or this will be taken to the next step. Joan Hoff, Library Board President." (DPFOF ¶ 87)

On March 16, 2004, Ms. Bladek received a written warning, a "Disciplinary Action Report." (DPFOF ¶ 88).

The reasons for said action were listed as excessive absences or lateness, unsatisfactory work performance, refusal to perform assigned work, insubordination and violations of rules. A description of the incidents giving rise to the disciplinary action were attached to the form. That narrative states as follows:

Suellen Bladek Disciplinary Action Report March 16, 2004

Description of Incident - from page one

Item 1.

On February 11, you left work at 2 p.m., stating you weren't feeling well and that you didn't want to spread your germ to library patrons. At approximately 3:30/3:45 p.m., you were at school coaching volleyball.

On February 13, I met with you, and you stated you were indeed sick and had to go home and rest. But you then went to school around 3:30 p.m. and met with Michael Maxson, the school Principal, and explained that you were not well. Together, you decided it was absolutely necessary for you to coach because of the upcoming tournament, and that you had no choice but to do it. The other coach could not possibly coach both teams at one time, and that you had a contract with the school and that you simply had to be there. You said Mr. Maxson was well aware of the situation, but he said that you just had to be there.

I called Mr. Maxson and explained your position re their meeting. I asked if that was his view of what happened. Mr. Maxson said, "No." After further discussion,

4

he said he may have seen you in passing in the hall, and that he thought you said your throat was scratchy and that you hoped it wasn't serious. No actual discussion took place with you regarding your contract or his requirement that you work regardless of your health.

Item 2.

On March 3, I received a telephone message to call Carol at (redacted) after 4:15 p.m. I called the number at 7:15 p.m. and Brian, the owner of Ruby Heating answered. He said at some time in the past you had left a message on his phone, but that he had not talked to you personally. He was very angry and said I should "tell you to stay away from his kids and to leave his kids out of this." He said you had talked to his daughter at volleyball and had stated to her, "The President of the Library Board wants the work in the basement finished, and that your dad had better hurry up and get the work done." He also said you were not acting professionally, and that he didn't appreciate your talking to his daughter. I had to assure him that this would be looked into and necessary action taken.

Item 3.

Miscellaneous items indicating unsatisfactory work performance or refusal to perform assigned duties.
*       You signed a contract to coach volleyball for the school during your work hours without the notification or permission of the board. You must have the board's permission in the future.
*       Did not provide the Board with telephone bills for the past three months, along with credit information, to the Board as requested.
*       Financial data as supplied by the Village is either absent or incomplete when you provide your financial report to the Board.
*       The elevator issue has been an agenda item since November, and we still do not have the information to make an intelligent decision regarding a maintenance contract with a company of our choice.
*       You did not post the Closed Session notice for the Personnel Committee meeting of February 18 according to established procedures; and when asked about it, you stated a notice for a committee meeting did not have to be noticed the way a full board notice is done. This is not accurate.
*       You have refused to prepare Board packets as requested by the President for the past four months.
*       You refused to include a complete apology for the Gift Fund report you presented to the Village Board at their February meeting as the President had drafted for you. You argued you did not see why you had to apologize in the first place.
*       You did not follow the accepted "chain of command" when you decided not to attend the March Village Board meeting. You knew you should have notified the

5

President of your intention, but instead e-mailed a notice to the Village President. In the future, all communication with the Village Board will first go through the Library Board. The reason is that the Village President has enough responsibility managing the Village affairs. This is not the first time you had gone around your immediate supervisor, and it must not happen again.

*       You did not distribute Landscaping Program notices as asked to do by the President. On two occasions, I stood at the desk and watched as you and/or staff checked out books for patrons, and never mentioned the program nor gave them their individual notice. Also, you/staff did not distribute these notices to individuals attending meetings in the building. I spoke to the quilters at their March meeting; and when I was finished, I said I hoped to see them at the Landscaping program on Thursday, and they knew nothing about it.

*       Both the projector and the microphone did not work the night of the Landscaping program. As Library Director it is your responsibility to see that the equipment works properly. You made a minimum effort to see that the projector and microphone worked even though you knew the importance of their functioning properly for the program.

*       You, as well as staff, do not punch out from work as instructed. It is your responsibility to see that staff use the time clock properly, and forgetting over and over is no excuse.

(DPFOF ¶ 89.)

The problems with Bladek's work performance are also extensively discussed in the "undated" last performance evaluation. (DPFOF ¶ 91.)

Ultimately, the entire Library Board agreed that Bladek's employment was no longer tenable in the Village of Campbellsport. (DPFOF ¶ 77). When asked if any individual Board member was primarily responsible for Bladek's termination Senn testified that "there were seven pairs of eyes" on the Board who saw "what was going on with Suellen." (DPFOF ¶ 86). The entire Library Board voted to terminate Bladek, with two members abstaining. (DPFOF ¶ 93.)

Bladek was served with a letter of termination from employment on May 25, 2004. (DPFOF ¶ 92.)

6

The claims in Bladek's complaint arise out of a series of actions culminating in the termination of her employment as Library Director by the Library Board. (DPFOF ¶ 7.) Prior to her termination, Bladek made complaints regarding three issues. (DPFOF ¶ 8.)

Bladek's first complaint is that in November of 2003, Hoff wanted to remove the personnel files from the library building and Bladek told Hoff that it was "against Village policy" to remove the files from the library. (DPFOF ¶¶ 9, 94, 102).

Bladek admitted in her deposition that no policy existed regarding the removal of personnel files. (DPFOF ¶¶ 103-04.)

Bladek complained for the first time about the removal of the personnel files in November of 2003. (DPFOF ¶ 95.) Bladek complained to Hoff and the Department of Public Instruction when the files were taken from the library. (DPFOF ¶ 101.)

Hoff removed the personnel files from the library to review them in her capacity as Library Board President. (DPFOF ¶ 96.) Hoff removed the personnel files for review of financial issues at the library. (DPFOF ¶ 97.)

After Bladek complained about the personnel files being removed they were returned to the library. (DPFOF ¶ 105.)

In January of 2004, Hoff and the Library Board agreed to keep the gift fund records from the library at the home or office of Raelene Guenther ("Guenther"), the Library Board Treasurer, rather than at the library. (DPFOF ¶¶ 10, 107.) Bladek complained to Mike Cross ("Cross"), at the Department of Public Instruction, to the Village Board President Dean Uleman ("Uleman"), and to Hoff about the records being taken to the home or office of Guenther. Bladek complained for the first time about this in January of 2004. (DPFOF ¶ 107.)

7

Guenther is a former member of the Library Board and the former Treasurer of the Library Board. (DPFOF ¶ 108.) Guenther took the gift fund financial records from the library to her office in order to balance the checkbook. (DPFOF ¶ 109).

Guenther testified that Bladek complained to the Campbellsport Village President, Uleman, about the gift fund records. (DPFOF ¶ 115). In turn, Uleman contacted Guenther. (DPFOF ¶ 116). Guenther indicated that she said she did not have a problem with returning the records to the library but it was just easier for her as Treasurer to work with the records at the law office. (DPFOF ¶ 117).

At no time was it ever determined that it was improper to have taken the records out of the library. (DPFOF ¶ 118). Guenther checked the statutes, and there is no prohibition for a member of the Library Board having the records for the gift fund in their possession. (DPFOF ¶ 111). In point of fact it is the Library Board to whom the statutes gives custodianship of the records. (DPFOF ¶ 112).

However, Bladek wanted this information kept at the library. (DPFOF ¶ 113). Bladek has fully admitted that she has no evidence that Guenther's keeping the gift fund financial records in her possession violated any policy or procedure of the Village of Campbellsport. (DPFOF ¶ 119.)

According to Guenther, Uleman took the approach that in order to appease Bladek, Uleman asked Guenther to please bring the records back to the library. (DPFOF ¶ 120).

It is Guenther's opinion that this kind of appeasement was a pattern in the Village for a number of years. (DPFOF ¶ 121.)

In early 2004, in the process of attempting to balance the library budget, it came to the Library Board's attention that 71% of the library's budget was going to salary and benefits. (DPFOF ¶ 125.)

This was an ongoing issue for the library. All Board Members agree that this was an exorbitant amount of the library's budget to dedicate to salary and benefits. (DPFOF ¶ 126.)

The Library Board felt that more money should be spent on programming and on the library's collection. (DPFOF ¶ 128.) The Library Board looked at library usage on the most heavily traffic days and during the most heavily traffic hours in the library. (DPFOF ¶ 129.)

Further, the Library Board decided that given use patterns, the library was overstaffed. (DPFOF ¶ 134.) Therefore, the Library Board made an executive decision to cut back hours in order to save money for the library. (DPFOF ¶ 137.)

The Library Board made a decision to cut back hours on days and times where there was less library patronage. (DPFOF ¶ 130.) In reaching its decision to cut back the library's hours, the Library Board was keenly aware of its duty to use library funds in a manner which provided the highest level of service to the community. (DPFOF ¶ 127.)

This decision was made in open session of the Library Board. (DPFOF ¶131.) Bladek has acknowledged this. (DPFOF ¶ 132.)

All members of the Library Board voted and agreed on this approach. Bladek complained about the decision to cut back the library's hours, but there was no fiscally reasonable alternative. (DPFOF ¶ 138.)

In March and April of 2004, Bladek complained that the Library Board changed the library's operating hours without first having an open meeting. (DPFOF ¶ 11.)

Bladek admitted that she did not know if any of her three complaints which form the basis of this lawsuit were policy violations. (DPFOF ¶ 141.)

Case 1:04-cv-00715-WEC   Filed 10/27/05   Page 9 of 29   Document 75

Finally, the parties are in dispute as to what the Library Board's motivation was when it decided to fire Bladek. (DPFOF ¶ 142; Pl.'s Resp. to DPFOF ¶¶ 12, 14, 19.)  The quality of Bladek's performance as Library Director is also in dispute. (*See e.g.*, DPFOF ¶¶ 17, 30 32-33, 37, 38, 44-45, 47, 50-51, 57-60, 62, 65, 67, 73, 85, 114  Pl.'s Resp. to DPFOF ¶¶ 12, 19, 32, 45, 47, 50-51, 57-60, 62, 65, 67, 73, 114 ) And whether Bladek was apprised of the purportedly ongoing concerns the Library Board had with her performance is also in dispute.  (DPFOF ¶ 18, 34; Pl.'s Resp. to DPFOF ¶ 18, 32.)

## II. SUMMARY JUDGMENT STANDARD

A district court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (quoting advisory committee's note to 1963 amendment of Fed. R. Civ. P. 56(e)).  "Summary Judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477

10

U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). To state it differently, "[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (quoting *Anderson*, 477 U.S. at 255). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than 'some metaphysical doubt as to the material facts.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting *Johnson v. University of Wisconsin-Eau Claire*, 70 F.3d 469, 477 (7th Cir. 1995)). A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Id.* (citing *Anderson*, 477 U.S. at 252).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

11

## III. DISCUSSION

The Village of Campbellsport ("Campbellsport") moves for summary judgment arguing that the complaints Bladek made regarding the personnel files, the gift fund financial records, and the reduction in the library's hours were not constitutionally protected because they did not address issues of public concern. Campbellsport further argues that even if Bladek's complaints are found to be constitutionally protected, her complaints were not a motivating factor in the Library Board's decision to terminate her.

The court engages in a three-step analysis when considering a claim under § 1983 for retaliation in violation of the First Amendment. First, the court must determine whether the plaintiff's speech is constitutionally protected by applying the *Connick-Pickering* test. *Sullivan v. Ramirez*, 360 F.3d 692, 697 (7th Cir. 2004). Second, the burden shifts to the plaintiff to establish that the constitutionally protected speech was a substantial or motiving factor in the retaliatory action. *Id.* Third, the defendant has the opportunity to establish that it would have taken the same action in the absence of the constitutionally protected speech. *Id.* If the defendant shows that it would have taken the same action in the absence of the constitutionally protected speech, then the plaintiff "'bears the burden of persuasion to show that the defendant's proffered reasons were pretextual and that discrimination was the real reason why the defendant terminated plaintiff.'" *Gazarkiewicz v. Town of Kingsford Heights*, 359 F.3d 933, 940 (7th Cir. 2004) (quoting *Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002).

The first step of this analysis, determining whether Bladek's speech is constitutionally protected, is a question of law for the court. *Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999). The threshold question in assessing whether Bladek's speech is constitutionally protected is whether

12

her speech addressed a matter of public concern. *See Connick v. Myers*, 461 U.S. 138, 146 (1983). If this hurdle is cleared, then the court must address whether Bladek's interest in expression is "outweighed by any injury the speech could cause to the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Waters v. Churchill*, 511 U.S. 661, 668 (1994) (internal quotations omitted).

## A.  Matter of Public Concern

Whether an employee's speech addresses a matter of public concern is determined by examining "the content, form, and context of [the speech], as revealed by the whole record." *Connick*, 461 U.S. at 147-48.  Of the three factors to be examined, the content of the speech is the most important. *Gustafson v. Jones*, 290 F.3d 895, 907 (7th Cir. 2002).  A government employee's speech relates to a matter of public concern if it "can fairly be said to relate to a matter of political, social, or other concern to the community, rather than merely a personal grievance of interest only to the employee." *Id.*  Thus, the court must ascertain whether the employee's motivation in speaking was to bring wrongdoing to light, to raise other issues of public concern because they are of public concern, or instead, to further some purely private interest. *Kokkinis*, 185 F.3d at 844.

In *Connick*, the U.S. Supreme Court indicated that the standard for determining whether expression is of public concern is the same standard used to determine whether a common-law action for invasion of privacy is present.  461 U.S. at 143 n.5.  The Supreme Court further indicated that this standard, established by the Court in *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975) and *Time, Inc. v. Hill*, 385 U.S. 374 (1967), "make[s] clear that public concern is something that is . . . a subject of general interest and of value and concern to the public at the time of publication." *City of San Diego v. Roe*, 125 S.Ct. 521, 525-26 (2004).

13

Bladek argues that on three separate occasions she spoke out on issues of public concern and that because of her speech on these issues she was terminated from her position as Library Director. Bladek argues that her complaints regarding the following three issues constituted speech on a matter of public concern: (1) Hoff's decision to take the personnel files from the library to Hoff's residence; (2) the Library Board's decision to have the gift fund financial records kept at the home or office of the Library Board Treasurer, Guenther; and (3) the Library Board's decision to change the hours of the library as well as Bladek's concerns that the Library Board's decision was not made in compliance with the open meetings laws. Bladek's speech concerning each of these issues will be addressed in turn.

### 1. Removal of Personnel Files

In November of 2003, Hoff removed the personnel files from the library building and took them to her home. (DPFOF ¶¶ 9, 94, 97, 102.) Bladek "expressed deep concern [to Hoff] that [the personnel] files were required to stay in the building and that [Hoff] could review the files in the building but they were not allowed to be taken from the building." (Bladek Dep. at 49, lines 4-7.) Bladek expressed these concerns to Hoff directly, and then asked the following people as to what their opinions were on removing the personnel files from the library: the Village President of Campbellsport Dean Ulemen ("Uleman"), Diane Lempke, Mark Arend ("Arend"), who works in the Winnefox Library System, and Mike Cross ("Cross"), who works for the Department of Public Instruction (DPFOF ¶ 101.) Bladek argues that her complaints regarding the removal of the personnel files addressed a matter of public concern because the public has "an interest in a public employer taking public property to her home, especially when that public property contains private information about public employees . . . [because accidental] disclosure of the [private] information

14

could have led to a lawsuit, or at least scandal." (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Br.") at 7-8.)

Admittedly, Hoff's decision to take the personnel files home to review them rather than reviewing them at the library may be of *some* interest to the public. However, simply speaking on a topic that may be of some interest to the public does not necessarily mean that the statements address a matter of public concern. Rather, the court must "'delve deeper into the *precise* content, form, and context of speech that admittedly may be of some interest to the public.'" *Kokkinis*, 185 F.3d at 844 (quoting *Cliff v. Board of Sch. Comm'rs of City of Indianapolis*, 42 F.3d 403, 410 (7th Cir. 1994) (emphasis added).

An examination of the precise content of Bladek's complaints reveals that she was not concerned with the "accidental disclosure of private information," but rather, with the location of the personnel files as well as her notion that Hoff's removal of the files violated an internal library policy. (Bladek Dep. at 50-51, lines 22-25, 1-10, 18-25.) Moreover, Bladek herself indicated that it was standard procedure for librarians to contact the Department of Public Instruction for advice regarding *operational* questions, thereby indicating that her concerns were regarding the library's internal operating procedures. (Bladek Dep. at 59, lines 19-22.) (emphasis added)

Bladek also argues that her speech addressed a matter of public concern because the removal of the files "create[d] the appearance of government fraud" and that "this appearance of corruption and impropriety" motivated Bladek's complaints. (Pl.'s Br. at 8.) The Seventh Circuit Court of Appeals has "'consistently held that speech alleging government corruption and malfeasance is of public concern in its substance.'" *Schad v. Jones*, 415 F.3d 671, 675 (7th Cir. 2004) (quoting *Spiegla v. Hull*, 371 F.3d 928, 937 (7th Cir. 2004)). In *Propst v. Bitzer*, 39 F.3d 148 (7th Cir. 1994), the

15

Seventh Circuit stated that it "recognize[s] the importance of an employee's interest in pointing out a misuse of public funds or other breach of public trust . . . [and that] speech that seeks to expose improper operations of the government or questions the integrity of governmental officials clearly concerns vital public interests." 39 F.3d at 152 (internal quotations omitted).

However, unlike in *Propst*, Bladek did not allege that Hoff misused any of the private information contained in the personnel files. While Bladek did allege that Hoff acted improperly by taking the personnel files to her home, that was only because she believed that there was an internal library policy which existed that prevented Hoff from doing so, not because of the "appearance of government impropriety." Simply put, Bladek's argument that keeping public employees' personnel files at a private home creates the appearance of government impropriety is not enough to transform her complaints regarding an internal library policy (or lack thereof) into a matter of public concern. Bladek's complaints regarding Hoff's removal of the personnel files are more aptly described as complaints regarding the library's internal operating procedures, rather than concerns regarding matters of "'political, social, or other concern to the community.'" *Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 973 (7th Cir. 2000) (quoting *Connick*, 461 U.S. at 146.)

"Speech by a government employee relating to ordinary matters of internal operation and lacking connection to 'any matter of political, social, or other concern to the community' is not entitled to First Amendment protection." *Spiegla*, 371 F.3d at 936 (quoting *Connick*, 461 U.S. at 146). Furthermore, the Seventh Circuit has cautioned that "if every facet of internal operations within a governmental agency were of public concern, and therefore any employee complaint or comment upon such matters constitutionally protected, no escape from judicial oversight of every government activity down to the smallest minutia would be possible." *Kuchenreuther*, 221 F.3d at

16

974 (internal quotations and citations omitted). Thus, because this court concludes that Bladek's complaints regarding Hoff's removal of the personnel files from the library were merely comments upon the internal operations of the library, her complaints are not entitled to First Amendment protection.

Although not particularly necessary, it is also worth noting that the context and form of Bladek's complaints regarding the removal of the personnel files also weigh in favor of this court's conclusion that Bladek's speech regarding the personnel files did not address a matter of public concern. Simply stated, when examining the context and form of the plaintiff's speech the court must determine whether the speaker is speaking "'more like a citizen or [more like] a disgruntled employee whose statements are primarily of personal interest.'" *Button v. Kibby-Brown*, 146 F.3d 526, 530 (7th Cir. 1998) (quoting *Colburn v. Trustees of Ind. Univ.*, 973 F.2d 581, 585 (7th Cir. 1992)).

Bladek's speech regarding the removal of the personnel files is more aptly described as complaints made by a "disgruntled employee" rather than complaints regarding a matter of public concern by a "private citizen." Although speech need not be addressed to the general public to be protected, choosing a form of speech routinely used for intra-office communications may lend credence to the conclusion that the employee was not speaking as a citizen. *Schad*, 415 F.3d at 676. In this case, rather than attempting to bring her complaints regarding the personnel files to the attention of the public, Bladek simply made her way up the internal chain of command by contacting her superior, her superior's superior, Uelman, and then proceeding to inquire as to other libraries' policies regarding the issue. *See Wallscetti v. Fox*, 258 F.3d 662, 667 (7th Cir. 2001) ("The form of Wallscetti's speech, contacting her supervisors' internal superiors rather than attempting to bring the

17

harassment in view of those outside the administrative structure, further supports finding that her complaints are not protected.").  Thus, after examining the content, form, and context of Bladek's speech regarding the removal of the personnel files from the library, this court concludes that Bladek's speech did not address a matter of public concern and is therefore not protected by the First Amendment.

### 2.  Gift Fund Financial Records

In January of 2004, the Library Board decided to keep the library's gift fund financial records at the home or office of Guenther, the Library Board Treasurer, rather than at the library.  (DPFOF ¶¶ 10, 107.)  Again, Bladek was concerned that this decision violated a library policy, and expressed her concerns to Hoff, Uleman, Arend, and Cross. (DPFOF ¶ 107; Bladek Dep. at 57-58, lines 21-25, 1-8.)  Bladek was concerned because she was not aware if it was legal for Guenther to keep the gift fund records, public records, at her home or office, and she "wanted to verify that it . . . was acceptable to have that public information at [Guenther's] personal residence."  (Bladek Dep. at 57, lines 7-11.)

Bladek argues that "where and how public financial records are kept is clearly an issue of public concern," because keeping public records at a private individual's home "create[s] the appearance of impropriety or corruption."  (Pl.'s Br. at 6-7.)   While it is true that speech highlighting the mismanagement of public funds or the misuse of public funds has been held to constitute speech on a matter of public concern, such is not the case before the court.  *See Gazarkiewicz*, 359 F.3d at 941.  Bladek did not allege any misuse of public funds or the mismanagement of public funds.  Moreover, a review of the precise content of her speech reveals that Bladek was concerned that it was either illegal or violated library policy to have the gift fund

Case 1:04-cv-00715-WEC   Filed 10/27/05   Page 18 of 29   Document 75

financial records kept at a private residence or private office: Bladek was primarily concerned with the location of the records, not with the mismanagement or misuse of the funds.

Bladek's argument that keeping public financial records at a private home creates the appearance of government impropriety is not enough to transform her complaints regarding a Library Board policy into a matter of public concern. While the plaintiff is correct that speech which is designed to bring "potential wrongdoing" to light is protected, that potential wrongdoing must still be of "political, social, or other concern to the community." *Schad*, 415 F.3d 676 As with Bladek's speech regarding the removal of the personnel files, it is highly implausible that the *location* of the library's gift fund financial records is a matter of "concern to the community." Thus, Bladek's complaints regarding the Library Board's decision to have the gift fund financial records located at Guenther's home or office are more aptly described as complaints regarding ordinary matters of internal operation of the library rather than concerns regarding matters of "political, social, or other concern to the community." *Connick*, 461 U.S. at 146.

Again, it is worth noting that the context and form of Bladek's complaints regarding the location of the gift fund financial records also weigh in favor of this court's conclusion that her speech did not address a matter of public concern. Bladek's speech regarding this issue is more aptly described as complaints made by a "'disgruntled employee'" rather than complaints made by a private citizen. *See Button*, 146 F.3d at 530 (quoting *Colburn*, 973 F.2d at 585). Bladek again simply took her complaints up the internal chain of command rather than attempting to bring her complaints to the attention of the public. Thus, after examining the content, form, and context of Bladek's speech regarding the Library Board's decision to have the gift fund financial records kept

at the home or office of Guenther, this court concludes that Bladek's speech did not address a matter of public concern and is therefore not protected by the First Amendment.

### 3. Change in Library's Hours and Alleged Open Meetings Law Violation

In March and April of 2004, Bladek expressed concern that the Library Board's decision to change the library's hours was not made in compliance with the open meetings laws. (DPFOF ¶ 11; Bladek Dep. at 59, lines 2-5.) Bladek expressed these concerns at the Library Board meeting when the decision was made, and subsequently to Hoff, Uleman, Arend, Cross, a member of the Village Board, Wendy Daniels, the Fond du Lac County District Attorney's Office, and the local police chief, Randy Karosis. (Bladek Dep. at 59-61; Campagna Dep. at 20, lines 18-19.) Bladek also expressed her concerns to library patrons, when they asked why the library's hours had been changed. (Hoff Dep. at 60, lines 1-7.) And, a letter to the editor of the local newspaper written by Deb Haegler regarding the library's change in hours contained figures from the library's annual report that only Bladek could have provided to Haegler. (Hoff Dep. at 60, lines 18-22.)

Bladek argues that her speech regarding the Library Board's decision to change its hours as well as her allegations that the decision was not made in compliance with the open meetings laws addresses a matter of public concern because the public, in fact, was concerned about this issue. Although evidence of actual public interest is not dispositive of whether speech is on a matter of public concern, the fact that the press or other citizens were also interested in the propriety of the Library Board's decision is certainly relevant to the issue. *See Gustafson*, 290 F.3d at 907; *See also Auriemma v. Rice*, 910 F.2d 1449, 1460 (7th Cir. 1990) (en banc). As evidenced by the sixteen members of the public who attended the next Library Board meeting to express their concerns regarding the change in hours, as well as the petition started by a citizen to reopen the library in the

morning that was signed by 78 other members of the community, it appears that other citizens of

Campbellsport were interested in the propriety of the Library Board's decision to cut the hours.

(Kinne Aff. Exh. P at 1,4.)  This fact lends credence to the conclusion that the content of Bladek's

speech was a matter of social or cultural concern to the community.

Moreover, whether public officials are fulfilling their governmental duties in an ethical and

legal manner is a quintessential issue of public concern.  *See e.g., Greer v. Amesqua*, 212 F.3d 358,

371 (7th Cir. 2000); *see also Glass v. Dachel*, 2 F.3d 733, 741 (7th Cir. 1993) (stating that "matters

of public concern do include speech aimed at *uncovering* wrongdoing or breaches of the public

trust") (emphasis added).   Bladek sought to expose what she considered to be wrongdoing, or

potential wrongdoing, by contacting law enforcement officials to determine whether the Library

Board's meeting and subsequent vote to change the library's hours were held in compliance with the

open meetings laws.   In *Dishnow v. School District of Rib Lake*, the Seventh Circuit held that a

guidance counselor's disclosure to the media of the school board's alleged violation of a local open

meetings law was speech which addressed a matter of public concern.  77 F.3d 194, 197 (7th Cir.

1996).  Specifically, the Seventh Circuit stated that "when [the plaintiff] spilled the beans to the

media about the school board's violation [of the open meetings law] . . . he was participating in a

public dialogue on matters of interest to the public, and no more was required to place his speech,

prima facie, within the protection of the First Amendment."  *Id.*

That Bladek's allegations of a violation of the open meetings laws did not, in the end, prove

to be correct is irrelevant to this court's inquiry regarding whether Bladek's speech addressed a

matter of public concern.  The defendant's central argument, and apparently their only argument on

this issue, is that because no policies, procedures, or laws were actually violated, Bladek's complaints

Case 1:04-cv-00715-WEC   Filed 10/27/05   Page 21 of 29   Document 75

did not address an issue of public concern. (Def.'s Br. in Support of Mot. for Summ. J. ("Def.'s Br.") at 24.) However, the mere fact that there was an investigation and it was determined that no open meetings law was violated, after Bladek voiced her concerns, does not show that Bladek's speech was not a matter of public concern when she spoke. "'[A] public employee is not required to prove the truth of his speech in order to secure the protection of the First Amendment.'" *Gazarkiewicz*, 359 F.3d at 942 (quoting *Chappel v. Montgomery County Fire Prot. Dist. No. 1*, 131 F.3d 564, 576 (6th Cir. 1997)). Only if the employee knew that the content of the speech was false or if the employee made the statement with reckless disregard to the truth of the statement, will speech on a matter of public concern lose its First Amendment protection. *See Pickering v. Board of Ed. of Tp. High School Dist. 205*, 391 U.S. 563, 574 (1968). Moreover, it was Campbellsport's burden to show that Bladek made the statements knowing of their falsity or with reckless disregard to their truth, and Campbellsport has not provided any evidence suggesting either. *See Gazarkiewicz*, 359 F.3d at 942.

Campbellsport also argues that, because the "motivating factor behind Bladek's complaint is her personal dislike of the decision," her speech did not address an issue of public concern. (Def's Br. at 24.) Although the defendants characterize Bladek's complaints as merely personal grievances and insinuate that her complaints were motivated by personal animus against Hoff, they have presented no evidence showing that Bladek had a personal vendetta against Hoff. Moreover, although courts have found that statements made "for *purely* personal reasons rather than a desire to air the merits of the issue" were not speech on a matter of concern, *Smith v. Fruin*, 28 F.3d 646, 652 (7th Cir. 1994), *cert. denied* 513 U.S. 1083 (1995), "the fact that the speaker has a personal stake in the subject matter of her speech does not necessarily remove the speech from the scope of public concern." *Wright v. Illinois Dep't of Children & Family Services*, 40 F.3d 1492, 1501 (7th Cir.

22

1994); *see also Wainscott v. Henry*, 315 F.2d 844, 850 (7th Cir. 2003) (stating that "[a]n employee's speech on matters that might otherwise be protected cannot lose protection solely as a result of a history of animosity [between the employee and employer]").

Additionally, the argument that, even if Bladek's speech concerns matters of public importance, it is nevertheless not a matter of public concern because it was motivated by Bladek's personal interests, faces a high evidentiary burden. The Seventh Circuit has emphasized that speech of public importance is only transformed into a matter of private concern when it is motivated *solely* by the speaker's personal interests. *See Gazarkiewicz*, at 941-42; *see also Gustafson*, 290 F.3d at 908 (emphasizing that speech is transformed into a matter of private interest when it is "*only* motivated by private concerns" and further explaining that "even if [the plaintiffs] were advancing some private interests . . . their claim survives as long as they also intended to bring to light what they believed to be the negative . . . consequences of the new policy") (emphasis added). Thus, even if Bladek was advancing *some* private interests when she made her complaints, her claim survives as long as she also intended to bring to light was she believed was a bad policy decision by the Library Board as well as a potential violation of the open meetings laws.

Finally, this court turns to the context and form of Bladek's speech, and considers her motive for speaking and the circumstances in which she spoke. *Spiegla*, 371 F.3d at 938. Although Bladek again voiced her concerns to Hoff, Uleman, Arend, and Cross, she also contacted local law enforcement officers, and thus her complaints took on a more public quality than if she had merely relied upon the library's internal grievance procedures to voice her concerns. *See Wallscetti*, 258 F.3d at 667 ("The form of Wallscetti's speech, contacting her supervisors' internal superiors rather than attempting to bring the harassment in view of those outside the administrative structure, further

23

supports finding that her complaints are not protected.").  Bladek's contacts with the Fond du Lac County District Attorney's office, and subsequently, with the local police chief, which were admittedly made "outside the [library's internal] chain of command," lends a "public air" to her speech on this issue.  *See Glass*, 2 F.3d at 741 (taking complaints to county district attorney "lends a public air to the form of these complaints") (citation omitted); *Breuer v. Hart*, 909 F.2d 1035, 1038 (7th Cir. 1990) (stating that because the plaintiff "ultimately took his complaints to state authorities who had the prosecutorial authority to investigate them" this lent a "public air" to the form of the plaintiff's complaints).

Furthermore, the form and the context of the speech do not support the conclusion that Bladek was merely voicing a personal grievance out of personal animus toward Hoff.  In *Gazarkiewicz*, the employee posted a flyer in conjunction with another town resident at the local grocery store, and the court relied upon those facts in determining that the speech was motivated by public concerns rather than merely private ones.  359 F.3d at 943.  In this case, in addition to voicing her concerns to law enforcement officials and library patrons, it is likely that Bladek helped a concerned resident draft her letter to the editor concerning the Library Board's decision to cut back the library's hours because the figures (although allegedly inaccurate) contained in the letter to the editor could only have been provided by Bladek.  (Hoff Dep. at 60, lines 9-25.)  Writing a letter to the editor of the local paper in conjunction with another citizen is substantially similar to the posting of one's concerns on a flyer at a local grocery store, and thus, it appears that Bladek's speech was motivated by public concerns rather than merely private ones.

Campbellsport argues that because Bladek's complaints were motivated by Bladek's "personal dislike of the decision . . . .[her speech] falls far below the threshold to our constitutional

violation." (Def's Br. at 24.) However, "[p]ublic criticism of a government employer's policies can be protected speech." *Khuans v. Sch. Dist.*, 123 F.3d 1010, 1016 (7th Cir. 1997); *see also Perry v. Sindermann*, 408 U.S. 593 (1972). Thus, because Bladek's complaints to her superiors, law enforcement officers, and other citizens went beyond simple complaints regarding the impact of the change in hours on her own employment, and were not motivated solely by personal concerns, but rather by public concerns, this court finds that Bladek's speech concerning the alleged violation of the open meetings laws and regarding the Library Board's decision to reduce the library's hours is speech that addressed a matter of public concern.

B. *Pickering* Balancing Test

Because this court has found that Bladek's speech regarding the alleged open meetings violation and the Library Board's decision to reduce the library's hours addressed a matter of public concern, the court must next undertake the *Pickering* balancing test to conclude whether Bladek's speech is constitutionally protected. *See Kokkinis*, 185 F.3d at 843-44. Application of the *Pickering* balancing test is a question of law for the court. *See Wainscott*, 315 F.3d at 851. The *Pickering* balancing test requires this court to decide whether "'the interests of the [plaintiff], as a citizen, in commenting upon matters of public concern' outweigh 'the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Kokkinis*, 185 F.3d at 844 (quoting *Pickering*, 391 U.S. at 568). In *Gustafson*, the Seventh Circuit outlined a number of factors for courts to consider in conducting the *Pickering* balancing test:

> *Pickering* contemplates a highly fact-specific inquiry into a number of interrelated factors: (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place, and manner of

25

the speech; (5) the context within which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public.

290 F.3d at 909.

In this case, however, the defendant did not with any particularity address the *Pickering* balancing test in its briefs.[1] While Campbellsport outlines the factors to be considered when applying the *Pickering* balancing test, and analogizes this case to *Lifton v. Board of Educ. of City of Chicago*, 2005 WL 1705075 (7th Cir. July 22, 2005), it has not presented any arguments applying the factors outlined in *Gustafson* to the facts in this case. In a conclusory manner, Campbellsport states that the "time, place, and manner of Bladek's speech and its potential disruptiveness weigh heavily against Bladek," however, it does not provide any evidence to support this assertion.[2] (Def's Br. at 7.) Nor does Campbellsport provide any evidence that the employment relationship between the Library Board and Bladek was one in which personal loyalty and confidence was necessary. Thus, this conclusory statement, without more, does not suffice to carry the defendant's burden on this issue. *See Glass*, 2 F.3d at 744 (stating that the burden is on the government to "demonstrate a

---

[1] In its brief in support of its motion for summary judgment Campbellsport makes passing reference to the *Pickering* standard. (Def's Br. at 21.) In its reply brief, Campbellsport outlines the factors that should be considered when applying the *Pickering* balancing test, but it fails to provide any arguments applying those factors to the facts in the case at hand. (Def's Reply Br. at 5.)

[2] This court's review of the record reveals that, in her deposition, Hoff did state that Bladek's complaints regarding the Library Board's decision to cut the library's hours "had a tremendous negative effect" on the running of the library. (Hoff Dep. at 58, lines 13-17.) The negative effect, however, was "[Bladek's] badmouthing the board" to patrons, when "[the board] had said to her, Suellen, you must put on a good face on this." *Id.* This, without more, does not persuade the court that Bladek's speech was potentially disruptive, or that Bladek's speech impeded her responsibilities as Library Director.

26

state interest that outweighs [the employee's] First Amendment rights") (quoting *Rankin v. McPherson*, 483 U.S. 378, 394 (1987)).

### C. Substantial or Motivating Factor

To create a triable issue of fact regarding whether Bladek's protected statements constituted a substantial or motivating factor in her termination, Bladek "must produce sufficient evidence for a reasonable factfinder to decide that [the defendant] harbored a retaliatory intent." *Wallscetti*, 258 F.3d at 667-68. Bladek relies upon the temporal closeness of her speech and her termination to show that the Library Board "harbored a retaliatory intent" when they fired her. The Seventh Circuit has explained that "mere temporal proximity between the [speech] and the action alleged to have been taken in retaliation . . . will rarely be sufficient in and of itself to create a triable issue." *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002), *cert denied*, 537 U.S. 879 (2002). Bladek, however, does not *solely* rely upon the temporal closeness between her speech and her termination, but rather, provides substantive evidence showing that Library Board members were upset with Bladek for complaining about the library's change in hours, from which a reasonable jury could infer that the Library Board harbored a retaliatory intent.[3] Campbellsport presented evidence showing that the Library Board had problems with Bladek's performance as Library Director, including the verbal (written) warning and the March 16, 2004 "Disciplinary Action Report," from

---

[3] For example, Hoff testified that "[Bladek] was furious that [the Library Board] shortened the hours where she should have said, I see your point, we could do it with less people, we could do it with shorter hours *and she would have her job today*, if it was the spirit of cooperation, but you could not–you could not work with her." (Hoff Dep. at 55, lines 14-20.) (emphasis added). Monica LaFluer, a Library Board member, testified that "she thought Bladek was out of line for complaining about the way the board went about changing the library's hours of operation. (LaFleur Dep. at 12, lines 15-20.) Deborah Senn, another Library Board member, testified that Board members were frustrated with Bladek's opposition to the Board's decision to cut the hours. (Senn Dep. at 19, 18-25.)

Case 1:04-cv-00715-WEC    Filed 10/27/05    Page 27 of 29    Document 75

which a reasonable jury could conclude that Bladek's performance problems motivated the Board's decision to terminate her. However, Bladek disputes the veracity of these warnings/evaluations as well as the alleged problems with her performance as Library Director. Thus, taking all facts in the light most favorable to plaintiff, a reasonable jury could find that a motivating factor in the Library Board's decision to fire Bladek was her protected speech.[4]

## IV. CONCLUSION AND ORDER

In conclusion, and for all of the foregoing reasons, this court concludes that Bladek's speech regarding the removal of the personnel files and the gift fund records is not constitutionally protected, and that Bladek's speech concerning the Library Board's decision to change the library's hours is constitutionally protected. This court further concludes that there is a disputed issue of fact as to whether Bladek was fired because of her performance problems or whether at least a motivating factor in the Library Board's decision to fire Bladek was her protected speech. Thus, the defendant's motion for summary judgment is granted in part and denied in part.

**NOW THEREFORE IT IS ORDERED** that the defendant's motion for summary judgment be and hereby is **GRANTED** in part and **DENIED** in part;

**IT IS FURTHER ORDERED** that a status conference be conducted on Thursday, November 17, 2005, at 9:00 a.m. in Room 253 of the U.S. Courthouse, 517 E. Wisconsin Avenue, Milwaukee, WI 53202, for the purpose of discussing with the parties the further pretrial processing of this case.

---

[4] "'[S]ummary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi*, 184 F.3d at 691 (quoting *Smith*, 129 F.3d at 425).

**SO ORDERED** this  27th  day of October 2005, at Milwaukee, Wisconsin.

/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge